# WILLIAM LOGAN *vs.* CHARLES McGILL and MARY McGILL, his Wife.

Since the act of 1841, ch. 161, the *rent* of a farm devised to a married woman cannot, *during the life of the wife*, be made liable to execution for the debts of the husband.

The first section of the act of 1842, ch. 293, enables a wife to acquire title to any property real, and to slaves, in the mode therein specified, without the intervention of a trustee.

The act of 1841, ch. 161, does not destroy the tenancy by the curtesy, but suspends the right of execution during the life of the wife, leaving the judgment lien perfect on the life estate of the husband, to be enforced on the death of the wife.

APPEAL from the Circuit Court for Washington county.

This appeal was taken from a decision of the court below (PERRY, J.) upon a case stated, between the appellees, as plaintiffs, and the appellant, as defendant, the facts of which are sufficiently stated in the opinion of this court. The right of appeal to each party was reserved in the agreement of facts. The opinion and judgment of the court below was in favor of the plaintiffs. The opinion is as follows:

"I will not disguise the fact, that I have esteemed the true construction of the acts of 1841, ch. 161, and 1842, ch. 293, as a matter of much importance, and as affecting the interests of the community in regard to the marital and conjugal rights to such an extent, as to demand much investigation and care. The frequency with which I have been called upon to interpret their meaning, is evidence of the uncertainty and difficulty entertained in arriving at the legislative will. If those acts do design that the rents and profits of real estate, which has been acquired by a *feme covert* during coverture, should be exempted from execution against the husband, and such design can be seen, the court has no discretion, but is bound to respect it. On the other hand, if there should be found in the law any omission or that such was not intended, the judicial tribunals cannot usurp the legislative province, and supply that which is wanting to accomplish the intent of those acts; for as contended in such a case, the common law rule must apply. This is so fully established, I do not feel it necessary to refer to any authority except 2 *Binney*, 279, *Cresoe vs. Laidley*, and 1 *Bouvier's Law Dictionary*, 210.

"But is this a case to justify a resort to the common law doctrine? If the construction of the acts is adverse to the defendant, then the case is of course in that predicament which forbids their application, and, indeed, that which seems to me to be the only question for the court is, as to the rules of construing statutes and the intention of those acts.

"The cases of the *Canal Co. vs. The Rail Road Co.*, 4 *G. & J.*, 1. *Dulany vs. Tilghman*, 6 *G. & J.*, 464, and *The Mayor of Baltimore vs. Howard*, 6 *H. & J.*, 383, furnish the true rule by which statutes are to be construed, and establish

the principle, that all statutes upon or relating to the same subject are to be interpreted *pari materia,* and that every part of the statute is to be considered to arrive at the intention of the legislature.

"With the doctrine of those cases as a guide, can we see the object intended to be accomplished by the acts of 1841 and 1842? By the terms of the former, the real estate acquired by marriage shall not be liable to execution during the life of the wife for debts due from the husband. This act standing alone, the question might be environed with much more embarrassment. But the legislature, by the act of 1842, provides, 'that any married woman may become seized or possessed of any property real, or of slaves, by direct bequest, devise, gift, purchase or distribution, in her own name and as of her own property.' Was it intended that the rents and profits of the land of the wife acquired during coverture should be taken for the debts of the husband? Whether the moment they become in the nature of personalty or a '*chose in action*,' they vest by operation of law in the husband and become liable for his debts, and if possessed or become due before his death, would pass and be transmissible to his representatives as a part of his estate?

"By the act of 1841, the real property acquired by marriage cannot be sold for the debts of the husband, and by the act of 1842 it is provided, 'that the receipt of the labor of slaves acquired during marriage shall remain to the husband;' but it makes no such provision in respect to the rents of the land. The real property having been acquired in the same relation, and she to be possessed or seized of it in her own name and of her own property, and no such right given in regard to its products as is in respect to the hire of slaves, the conclusion seems to be reasonable, that such was not intended to be the property of the husband. No one can doubt, that if the act did not provide for the right of the husband to the hire of the slaves, the same difficulty and question would arise as to that which now exists in regard to the rents and profits of the real estate. Is not then the absence of such a provision an indication that the legislature deemed it necessary in regard to the rents of the

land? and does not the conclusion follow, as a necessary consequence, that the law-makers designed it should not be subject to the debts of the husband without that feature? The conjugal relation, by the common law, vests the legal title to land during coverture in the husband, and that title is subject (by the common law) to execution and sale. 2 *Kent's Com.,* 131. But by the act of 1842, the land thus acquired is to be held by the wife as 'her own and in her name.' The common law gives the title to the husband. The statute confers it upon the wife. By the former, the wife, during the life of her husband, has no present interest. By the latter, she has it entire, and 'as her own and in her name.' To give the land in her own name and as her property, and not to give the benefits incident to it in the same character, would be imputing to the legislature the design of conferring upon her a mere naked and formal title, without any advantage to attend it. A title for which no reason or necessity can be seen. We are to construe those acts *pari materia.* The act of 1841 forbids a sale of the land for the debts of the husband, and the act of 1842 vests the title in the wife, and yet all the profits of the land thus exempted from execution and which is held in the name of the wife, it is insisted, is to be liable. It may well be argued, that no good reason can be shown why there should be an exemption of the land and still the profits to be answerable, for if such is the case, would it not be disposing of the property in another shape? What is the land worth without the profits? It is that alone which imparts a value to it. Then it cannot be, as contended, that the act of 1842 leaves nothing but the legal title in the wife and still makes the rents liable for the husband's debts.

"It may be questioned whether more was not done by the act of 1841, and to give a different construction, is to impute, as before stated, to the legislature, the passage of unmeaning laws, and with having passed an act by which no apparent benefit was to be conferred. I cannot, in considering them together, do otherwise than believe that the legislature certainly did intend to confer a benefit upon the wife.

"It has been insisted, that there cannot be a separate estate

in the wife, because technical language, by which such an estate is conferred, is not found in either of those acts. That in cases of settlements or agreements for the separate estate of *feme coverts*, the law requires certain language to accomplish such a purpose, and authorities have been adduced to show the law in relation to that question. It is true that in deeds or agreements such is necessary, and in their absence, courts will not be permitted to impair the marital rights of the husband by a departure from those established rules. But when the legislature has indicated its will, no matter in what language, the court must yield implicit obedience to its authority. The legislature has determined that the land shall be held in the name and as the property of the wife. In cases of agreements, and when technical or sufficient language is not used, no such design can be accomplished. But when the law-makers have declared their intention, that intent must govern. If they have said such can be done and must be so, it is not in the power of the court to inquire why they have dispensed with the intervention of a trustee, or why they have not used the technical language found in the elementary books of the law on such subjects. I repeat, it is enough for the court to see the intention of the legislature, however expressed, and obey its requirements. It is a settled principle in the construction of statutes, that the intention is to prevail, and the circumstances which produced it is to be considered and not form is to control. *Young vs. The State,* 7 *G. & J.,* 253. *Beall vs. Harwood,* 2 *H. & J.,* 167."

From this decision, and judgment in conformity therewith, the defendant appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and MASON, J.

*Thomas Harbine* for the appellant, argued:

1st. That by the well known rule of the common law, the rents of lands belonging to *femes covert* are the property of their husbands, and liable to be taken in execution for their debts. 2 *Kent,* 129, 130. 1 *Roper on Husband & Wife,* 35.

2nd. That by no act of Assembly of Maryland has the com-

mon law rule been so much changed as to take away from the husband the rents and profits of the wife's real estate and make them her separate property. First, let us examine the act of 1841, ch. 161. Being in derogation of the common law, this act must be strictly construed. 8 *Gill*, 129, *Miller vs. Stewart.* 1 *Kent*, 464. *Dwarris on Statutes*, 695. Courts will not indulge in speculation to arrive at the intent of the legislature. *Dwarris*, 703, 708. Words of common use must be taken in their ordinary signification and import. 1 *Kent*, 462, and *note*. 2 *Barn. & Ald.*, 522, *King vs. Inhabitants of Turvey. Dwarris*, 702. The ordinary signification of the words "real estate" is land, and that does not include rent. 1 *Crabb on Real Property*, 66. Real estate is distinguished from personalty by its manner of devolving, and as the wheat in controversy was severed and threshed, it would clearly pass to the personal representatives and not to the heir at law. 1 *Crabb*, 4. 2 *Kent*, 131, 340, *note (a.)* 3 *Do.*, 402. *Comyn's Digest, (A,) 2, (G,)* 1. 1 *Wms. on Exc'rs,* 397, 698. 1 *Crabb*, 6, 11. This construction of that act would not avoid any beneficial operation of it, but would relieve the homestead from execution, which was the design of the law.

Nor has the husband been deprived of his right to the rents of his wife's land by the act of 1842, ch. 293. The words, "any married woman may become seized of real property, &c., in her own name and as of her own property," do not confer upon her a separate estate in lands thus devised and give her the rents and profits. To give the wife a separate estate, it must be done in clear terms; not by inference but by language—it must clearly appear beyond any reasonable doubt. 2 *Story's Eq.*, secs. 1381, 1382, 1383. *Hill on Trustees*, 421. 4 *Maddox*, 409, *Wills vs. Sayers.* 2 *Russell & Mylne*, 183, *Tyler vs. Lake.* 2 *Mylne & Keene*, 184, *Kensington vs. Dollond.* 1 *Ch. C.*, 194, *Dakins vs. Berisford.* 3 *G. & J.*, 508, *Carroll vs. Lee.* 6 *Md. Rep.*, 383, *Turton vs. Turto* . Every part of a statute will be considered in its construction. 6 *H. & J.*, 382, *Mayor & City Council of Balto. vs. Moore, et al.* The same property is, by the first section of this act, given to the wife in slaves as in real property, but that it gives no separate property is manifest, else the third section would

not give a separate property in slaves. The first section merely empowers a married woman *at law* to hold her *separate* property without the intervention of a trustee, which she could not do before. 2 *Story's Eq.*, sec. 1378. 2 *Crabb*, 1749.

In reply to the appellee's second point, that McGill rented the farm, as agent for his wife, and she, by virtue of the agreement with the tenant to pay the rents to her, would be entitled to them, we contend:—1st. That it does not appear from the facts in this case that the rents were to be paid to the wife; and 2nd, that by the common law, the rents were the husband's, (2 *Kent*, 129, 130,) and McGill could not, as against his creditors, *give them to her*, so as to authorise her to receive them from the tenant. 2 *Bland*, 561, *Helms vs. Franciscus*. 2 *Kent*, 129, and *note (b.)* 2 *Blackstone's Com.*, 422, and *note* 39. 3 *Am. Law Register*, 231, *Avery vs. Duane*. 3 *Atk.*, 72, *Beard vs. Beard*. 2 *Md. Ch. Dec.*, 360, *George vs. Spencer*. 2 *Story's Eq.*, secs. 1374, 1375. The appellees' authorities on this point do not apply to husband and wife, nor can the act of 1853, ch. 245, protect what the wife could not acquire.

On the appellee's third point, that until delivery of the rental proportion, the whole crop remains in the tenant, and therefore the landlord had nothing to levy upon, see 8 *Johns.*, 117, *Bradish vs. Schenck*. 3 *Do.*, 221, *Foote vs. Colvin;* but such is not the law of Maryland. 4 *Gill*, 209, *Ferrall vs. Kent.*

To the appellees' fourth point, that the rental proportion not being delivered, the right to it was a mere *chose in action*, not subject to execution, we reply, that though not delivered, yet it appears from the facts in the record that it was separated from the lessee's part of the crop, threshed and ready for delivery, and *only that part which was the landlord's was levied upon*, and hence it was subject to execution. 1 *H. & G.*, 308, *McElderry vs. Flannagan*.

*Richard H. Alvey* for the appellees, argued:

1st. That on a fair and liberal construction of the act of 1841, ch. 161, together with the act of 1842, ch. 293, these acts being intended as exemption laws, for the protection of

married women against the extravagance, prodigality and dissipation of their husbands, the property levied upon, under the facts of this case, was not liable for execution for the satisfaction of the debts of the husband during the life of the wife. That upon the true construction of these acts, the legislature intended to confer benefit and protection upon the wife, and to further and effect that object, these acts should receive a liberal and beneficial construction, even though such construction be without the apparent letter of the statute. 4 *G. & J.,* 152, *Canal Co. vs. Rail Road Co.* 11 *Coke,* 73, *Magdalen College case.* 6 *Bac. Abr.,* 384. *Plow.,* 205, *Stradling vs. Morgan.* 1 *Kent,* 462 to 464. 4 *Md. Rep.,* 1, *Cassilly, et al., vs. Meyer, et al.* 11 *G. & J.,* 490, *Lucas vs. The Lottery Commissioners.* 12 *Do.,* 1, *Lucas vs. McBlair, et al.* 7 *Md. Rep.,* 76, *Gibbs vs. Gale.*

2nd. But suppose it should be thought that the property levied on under the facts of this case was not within or comprehended by the acts of 1841 and 1842, yet under the facts of this case the wife could have a right to the rents reserved, it being agreed that the land was rented for and in the name of the wife, and though the wife would not take the rental proportion of the grain technically as rent, she would be entitled to it by virtue of the contract with the tenant. And on a formal state of pleading under the facts of this case, the wife, being the meritorious cause of the action, would be entitled to sue with her husband on the contract with the tenant. 3 *Cruise Digest, tit., Rent,* 78, 319, 320. 1 *Hilliard on Real Property,* 242. 5 *Watts,* 134, *Ege vs. Ege.* 1 *H. & G.,* 139, *Higdon vs. Thomas.* 1 *H. & G.,* 484, *Owings vs. Owings.* 1 *Chitty's Pl.,* 26. 1 *Story's Eq., sec.* 336. And under the act of 1853, ch. 245, all the rights or property acquired by the wife in this case, by virtue of the contract with the tenant, are protected from the debts of the husband and are not in any way liable to execution for such debts.

3rd. Where the rent reserved is a proportion of the crop, the whole property in such productions remains in the lessee till it is divided and the lessor's share *delivered* to him. 1 *Hilliard on Real Property, tit., Rent, ch.* 16, *sec.* 4, *page* 236. 9

*Johns.*, 113, *Stewart vs. Doughty.* 5 *Watts & Sergt.*, 157, *Rinehart vs. Olwine.* 1 *G. & J.*, 266, *Hoskins vs. Rhodes.*

4th. The rental proportion not having been delivered before the levy of the execution, the right, at most, was but a mere *chose in action*, which is not subject to execution. 6 *H. & J.*, 266, *Harding vs. Stevenson.*

Le Grand, C. J., delivered the opinion of this court.

This is an appeal from the decision of the circuit court of Washington county on a case stated. The facts which it is necessary to notice are these:—certain parties obtained a judgment before a justice of the peace against the defendant, Charles McGill, and caused to be issued thereon a *fieri facias*, which was delivered to the appellant, as constable, for levy, which was accordingly done on a certain quantity of wheat alleged to be part of the yield and rent of a farm which had been devised to the wife of the said McGill. The farm was rented or leased by the said McGill, "for his wife, to a certain William Peter, who was tenant in possession, and who seeded on the said farm, as tenant as aforesaid, in the fall of the year 1853, a crop of wheat, and harvested or gathered the same in the summer of 1854, and that the said quantity of wheat so seized and levied upon as aforesaid, to satisfy the execution against the said McGill, was part of the rental proportion of the said crop of wheat so sown and gathered, which the said tenant, Peter, was to pay as rent for the said farm." The words of the devise are as follows: "I give and devise to my daughter, Mary McGill, and her heirs and assigns forever," &c.

The question is, whether, under the laws of Maryland, the crop or rent of the farm devised to Mrs. McGill be liable to execution for the debts due by her husband?

The act of 1841, ch. 161, provides, "that no real estate hereafter acquired by marriage shall be liable to execution, during the life of the wife, for debts due from her husband." And the first section of the act of 1842, ch. 293, declares, "that from and after the passage of this act, any married woman may become seized or possessed of any property real, or of

slaves, by *direct bequest, demise, gift, purchase* or *distribution,* in her own name and as of her own property; provided the same does not come from her husband after coverture."

We consider this case must be decided by the act of 1841; the section of the act of 1842 was designed to authorise a wife to acquire title to any property real, and *slaves,* in the particular modes therein pointed out, without the intervention of a trustee. The act of 1841 was intended to shield any real estate acquired by marriage from execution, during the life of the wife, for debts due by the husband. Although it does not destroy the tenancy by the curtesy, it nevertheless suspends the right of execution during the life of the wife, leaving, however, the judgment lien perfect on the life estate of the husband, to be enforced on the death of the wife. *Anderson, et al., vs. Tydings, et al., Ante.,* 427.

Whatever may be thought of the wisdom of such legislation, it is clear to our apprehension, that it was the purpose of the legislature to secure to the wife and husband the enjoyment of her real estate during her life. To allow the rent or yield of the property to be taken in execution for the debts of the husband, would be, in effect, to render the law in most cases wholly inoperative. Concurring with the court below, we accordingly affirm the judgment.

*Judgment affirmed.*